**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

|  |  |  |
|---|---|---|
| HAUTZ CONSTRUCTION, LLC, | : | |
| | : | |
| Plaintiff, | : | **Civil No. 12-3478 (FLW)** |
| | : | |
| v. | : | **OPINION** |
| | : | |
| H&M DEPARTMENT STORE, et al., | : | |
| | : | |
| Appellee. | : | |

Presently before the Court is a motion for reconsideration brought by Defendants H&M Hennes & Mauritz LP, incorrectly identified as H&M Department Store a/k/a Hennes & Mauritz, LP ("H&M" or "Owner") and Lakeview Construction ("Lakeview") (collectively, "Defendants"). Defendants move for reconsideration of the May 15, 2012 Order of The Honorable Phillip S. Paley, Judge of Superior Court of New Jersey, Law Division, Middlesex County ("State Court Judge"), who denied their motion to compel arbitration. Plaintiff Hautz Construction, LLC ("Hautz") has cross-moved for reconsideration of that portion of the same Order that dismissed defendants Dan Lopez and Jay Davis from the suit.  For the following reasons, the Court reconsiders the May 15th Order and concludes that Plaintiff's claims are subject to arbitration.  With respect to Plaintiff's cross-motion, the Court upholds the dismissal of Defendants Lopez and Davis

## I.      BACKGROUND

### A.      Facts

The following facts are taken from Plaintiff's Complaint and exhibits submitted by the parties.

Hautz generally alleges that Defendants failed to make payments allegedly owed for work performed by Hautz in connection with the construction of an H&M Department Store in Freehold, New Jersey ("the Project").  The Project was commissioned by H&M.  Lakeview served as the general contractor on the Project, and Hautz was one of Lakeview's subcontractors.  Lakeview and Hautz entered into three agreements whereby Hautz agreed to provide carpentry services for the Project.  The date range of the subcontract agreements spans from May 17, 2010 through August 13, 2010, *see* Green Cert., Exh. A (all three agreements), and provide for the application of Wisconsin law, without regard to its conflict of laws provisions, *id.* at Exh. B, ¶ 10.

Each subcontract addresses work to be completed by a particular date.  The first subcontract (No. 77596) addresses work to be completed by July 17, 2010.  The second subcontract (No. 77597) governs work to be completed by July 22, 2010.  Like the first, the third subcontract (No. 77598) also addresses work to be completed by July 17, 2010.  *See id.* at Exh. A.  While each subcontract provides its own completion date, all three broadly define the job start date as May 17, 2010, and the job completion date as August 13, 2010.  *Id.*

The terms and conditions associated with each subcontract agreement contain an arbitration provision, which provides, in pertinent part:

> ANY CONTROVERSY OR CLAIM ARISING OUT OF OR IN RELATION TO THIS PURCHASE ORDER/SUBCONTRACT OR ITS INTERPRETATION, CONSTRUCTION OR ANY BREACH THEREOF, OR ANY RELATIONSHIP BETWEEN THE PARTIES HERETO, WHETHER SUCH CLAIM IS GROUNDED IN COMMON LAW OR STATUTORY LAW . . . SHALL BE SETTLED EXCLUSIVELY BY ARBITRATION IN THE STATE OF WISCONSIN ....

*Id.*, Exh. B. at ¶ 13.

In addition, the terms and conditions make clear that the subcontract incorporates the terms

2

of the contract between Lakeview and H&M ("the Prime Contract"):

> . . . CONTRACTOR IS UNDER CONTRACT WITH THE ABOVE-REFERENCED PROJECT, THE TERMS OF THE CONTRACT, INCLUDING BUT NOT LIMITED TO LIQUIDATED DAMAGES, TIMELY COMPLETION, AND LIEN WAIVER UPON RECEIPT OF PAYMENT ARE INCORPORATED IN THIS PURCHASE ORDER/SUBCONTRACT BY REFERENCE.  CONTRACTOR'S PURCHASE ORDER/SUBCONTRACT TO SUBCONTRACTOR IS CONTINGENT UPON THE CONTRACT WITH THE TENANT/OWNER.

*Id.* at ¶ 9.

Further, the subcontract's terms and conditions obligate the subcontractor to obtain written permission from Lakeview before accepting any additional work from H&M: "THE SUBCONTRACTOR SHALL NOT ENTER INTO ANY AGREEMENTS WITH THE OWNER . . . WITH RESPECT TO THE PROJECT WITHOUT FIRST OBTAINING THE CONTRACTOR'S WRITTEN CONSENT." *Id.*, Exh. B at ¶ 26.  Similarly, the terms and conditions state that "NO EXTRAS WILL BE ALLOWED UNLESS APPROVAL IS GRANTED . . . IN WRITING ...." *Id.*, Exh. B at ¶ 2.  Moreover, Lakeview and Hautz also entered into a separate change order agreement that expressly states all change orders must be in writing. *Id.*, Exh. C at 1.

Notably different from the subcontracts, the the Prime Contract[1] does not contain an arbitration clause.[2]  Instead, the Prime Contract provides that disputes between those parties "can

---

[1]  At the Court's request, Defendants provided a copy of the agreement between H&M and Lakeview via an email attachment.  While there is no certification attesting to the authenticity of the agreement, Plaintiff does not dispute its authenticity.  Hence I may consider this document as part of the record.  *See Pension Benefit Guar. Corp. v. White Consol. Indus.*, 998 F.2d 1192, 1196 (3d Cir. 1993); *MDNet, Inc. v. Pharmacia Corp.*, 147 Fed.Appx. 239, 242 (3d Cir. 2005).

[2]  Indeed, the agreement redlines arbitration clause language that provided: "[a]ny Claim  arising out of or related to the Contract . . . shall . . . be subject to arbitration."  AIA Document A201-1997, General Conditions, ¶ 4.6.1 (redlined).

be the subject of litigation." AIA Document A201-1997, General Conditions, ¶ 4.5.1. In addition, and also unlike the subcontracts, the Prime Contract is "governed in all respects by the laws of the State of New York (without regard to the principles of conflicts of law) and for all purposes shall be construed in accordance with such laws," *id.* at ¶ 4.5.2. The Prime Contract, further, generally addresses the relationship between it and all subcontracts by providing that

> [e]ach subcontract agreement shall preserve and protect the rights of the Owner . . . and shall allow to the Subcontractor, unless specifically provided otherwise in the subcontract agreement, the benefit of all rights, remedies, and redress against the Contractor that the Contractor, by the Contract Documents, has against the Owner.

*Id.* at ¶ 5.3.1.

According to the First Amended Complaint ("complaint" or "Compl."), on July 20, 2010, while the subcontract work was still being completed, H&M requested that Hautz perform "work on weekends commencing July 23, 2010 through September 5, 2010 at weekend rates." Compl., ¶ 6. *See also* Hautz Cert., ¶ 4 (stating that Dan Lopez, the project manager for H&M, initiated the request for additional work). While the complaint does not specify the nature of the work to be performed, in Hautz's certification and brief, Hautz states that the work was, in part, "catch up" on the subcontracted work and, in part, additional work. *See* Hautz Cert., ¶ 7; Pl. Br. at 3. According to the complaint, Hautz prepared five invoices for the weekend work, but both H&M and Lakeview have refused to pay for the work completed at the rates allegedly agreed to by the defendants.[3] *Id.*

**B.    Procedural History**

Based on H&M's failure to pay, Plaintiff brought the instant suit against H&M, Lakeview,

---

[3]    To be clear, Defendants dispute that they agreed to pay higher rates for Plaintiff's work and, instead, assert that all the weekend work completed by Plaintiff was work called for by the subcontracts.

Lopez, and Davis for $256,787.88.   The suit was filed in the Superior Court of New Jersey, Law Division, Middlesex County, on December 30, 2011.  Thereafter, on February 1, 2012, Plaintiff filed its First Amended Complaint, asserting the following claims against all defendants:  breach of contract (First Count); quantum meruit (Second Count); fraud (Third Count); and Consumer Fraud (Fourth Count).  In that complaint, Defendants Lopez and Davis were, respectively, identified as H&M's and Lakeview's representatives.

On March 7, 2012, Defendants removed the suit to the United States District Court for the District of New Jersey.  At that time, the case was assigned to another District Judge who remanded the suit back to state court for lack of diversity jurisdiction because Defendant Lopez is a citizen of New Jersey, as is Plaintiff.  *See Hautz Construction, LLC v. H&M Department Stores, et al.*, Civil Action No. 12-1415 (MLC), Slip Op. (D.N.J. Mar. 20, 2012).   After the suit was remanded, Defendants moved to dismiss the First Amended Complaint, seeking an order compelling arbitration and, *inter alia*, seeking dismissal of the consumer fraud count.  Defendants Lopez and Davis, further, sought dismissal from the suit, contending that they were not subject to individual liability for their alleged actions.

On May 15, 2012, the State Court Judge issued an opinion ("the May 15th Opinion") granting in part and denying in part Defendants' motion.  The State Court Judge dismissed Dan Lopez and Jay Davis from the suit because, in his view, the complaint's allegations related to actions taking in their employment capacity and because Defendants had not raised the defense that Lopez or Davis acted outside the scope of their employment.  For these reasons, the Judge stated that he "discern[ed] no basis for continuing [Hautz's] claim against employees of the corporate defendants," and dismissed the breach of contract count as to Defendants Lopez and Davis only.  State Court

Opinion at 5-6. In addition, the State Court Judge dismissed the consumer fraud count in its entirety, holding that the transaction was not consumer in nature and, therefore, that Plaintiff's allegations did not fall within the purview of the New Jersey Consumer Fraud Act, N.J.S.A. 56:8-1, *et seq.*

With regard to Defendants' motion to compel arbitration, the State Court Judge held that Plaintiff was not obligated to arbitrate its "oral contract" dispute. The Judge reasoned that the complaint's allegations did not fall within the scope of the clause, *i.e.,* they did not arise out of or relate to the subcontract relationship, because it was "less than fully clear that the intent of the parties was to compel arbitration for weekend work." State Court Opinion at 6. The Judge further addressed whether the clause extended to H&M, as the clause is found only in the subcontract between Lakeview and Hautz. Viewing the issue as whether H&M could be bound as a non-signatory to the clause, he held that "arbitration agreements may be upheld against non-parties where the interests of such of such parties are directly related to, if not congruent with those of a signatory ...." *Id.* at 4 (quoting *Pritzker v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 7 F.3d 1110 (3d Cir. 1993)). Following the May 15th decision, Plaintiff filed a Second Amended Complaint on June 4, 2012.

The Judge's dismissal of Defendants Lopez and Davis had the effect of creating complete diversity between the parties, accordingly, on June 8, 2012, Defendants removed a second time to this Court. *See In re Diet Drugs*, 282 F.3d 220, 232 n.8 (3d Cir. 2002) ("[I]f subsequent pleadings or conduct by the parties or various other circumstances brings a case that was not previously removable within the removal jurisdiction of the federal courts, a second notice of removal is permissible."). Following removal, on June 15, 2012, Defendants filed the instant motion for reconsideration of the State Court Judge's May 15th Order. In response, on July 5, 2012, Plaintiff

filed a cross-motion for reconsideration of the Judge's decision relating to the dismissal of Defendants Lopez and Davis. The Court held oral argument on the motion and cross-motion on November 9, 2012.

## II.    STANDARD OF REVIEW

The Third Circuit has held that "whenever a case is removed, interlocutory state court orders are transformed by operation of 28 U.S.C. § 1450 into orders of the federal district court to which the action is removed. The district court is thereupon free to treat the order as it would any such interlocutory order it might itself have entered." *In re Diet Drugs*, 282 F.3d at 232 n.7. In the District of New Jersey, a district court may apply Local Rule 7.1(i) which allows parties to file a motion for reconsideration "within 14 days after the entry of the order or judgment on the original motion by the Judge." Local Rule 7.1(i).

Local Rule 7.1(i) allows parties to seek reconsideration by the Court of matters "which [it] believes the Court has overlooked" when it ruled on the initial motion. L. Civ. R. 7.1(i). The burden on the moving party, however, is quite high. The movant must demonstrate either: "(1) an intervening change in controlling law; (2) the availability of new evidence; or (3) the need to correct [a] clear error of law or fact [or to] prevent manifest injustice." *Lazaridis v. Wehmer*, 591 F.3d 666, 669 (3d Cir. 2010). The Court will grant such a motion only if the matters overlooked might reasonably have resulted in a different conclusion. *Bowers v. Nat'l Collegiate Athletic Assoc.*, 130 F.Supp.2d 610, 613 (D.N.J. 2001) *rev'd on other grounds by* 475 F.3d 524 (3d Cir. 2007).

## III.   DISCUSSION

Before turning to the merits, I must address the threshold issue of whether I should reconsider the State Court Judge's May 15th ruling. For the following reasons, I conclude that

reconsideration is appropriate.

### A.    Timeliness of Reconsideration Motion

As noted, motions for reconsideration should be filed "within 14 days of the order or judgment on the original motion by the Judge." Local Rule 7.1(i). Following removal to this Court on June 8, 2012, Defendants filed their motion for reconsideration on June 15, 2012, which is 31 days following the May 15th State Court Order. Plaintiff's cross-motion was filed even later on July 5th—a full 51 days following the May 15th ruling. Neither party filed a motion for reconsideration while in state court but, instead, waited until after the case was removed. Having far exceeded the 14-day deadline, both motions are untimely under Rule 7.1(i).

Plaintiff requests an extension of the filing deadline *nunc pro tunc*, but without any explanation as to why his cross-motion was untimely filed. Defendants, however, at oral argument, contended that their motion was timely, calculating the date for counting the 14 days as the date on which the case was removed. In Defendants' view, the trigger date is the date the order  became an order of this Court and started the clock running for reconsideration. That position is rejected. For one, the local rule provides that reconsideration must be filed "within 14 days of the order or judgment *on the original motion by the Judge*." L.Civ.R. 7.1(i) (emphasis added). By specifically referring back to the date the Judge decided the original motion, the rule makes clear that the ruling date starts the clock running for a reconsideration motion.

Moreover, Defendants' interpretation of the rule would lead to absurd results. Consider the following example. A state court judge issues a ruling on a motion and the time for reconsidering that ruling expires under state law. A year later, the plaintiff amends the complaint in a manner that makes the case removable. If the removal date were the trigger date, the defendants could seek

reconsideration of the earlier ruling even though the time frame for reconsideration had long passed. Certainly, the local rule does not create a windfall for a defendant who would seek to exploit the rules and restart the reconsideration clock anew. While I do not believe that Defendants here are attempting to exploit the rules, I cannot adopt their interpretation of the rule because it would encompass this sort of unintended result. Accordingly, I conclude that, counting from the date of the State Court Judge ruling, Defendants' motion for reconsideration is untimely.

While Defendants' motion is untimely, in light of the duty of lower federal courts to ensure that the Federal Arbitration Act. 9 U.S.C. § 1, *et seq.*, is properly implemented, I hereby relax the time for filing. *Accord Birt v. Ricci*, 2009 WL 1121461, *3 n.3 (D.N.J. Apr. 23, 2009) (enlarging time under Local Rule 7.1(i) to 30 days). This means that I will treat Defendants' motion, which raises the arbitration issue, as timely. Additionally, in an effort to ensure fairness to both parties, the Court further relaxes the deadline of the rule to encompass Plaintiff's belated filing of its cross-motion for reconsideration relating to the dismissal of Defendants Lopez and Davis. *See* L.Civ.R. 83.2 ("[A]ny Rule may be relaxed or dispensed with by the Court if adherence would result in surprise or injustice.").

I further note, alternatively, that the Court could "reconsider" in a manner consistent with the law of the case doctrine, under which doctrine there is no time limitation. *See generally Cobb v. George Weston Bakers Distribution, Inc.*, Civil Action No. 10–676 RMB/JS, 2012 WL 2344452 (D.N.J. Jun. 19, 2012) (discussing law of the case doctrine in a removed case). "Under the law of the case doctrine, district courts are permitted to reopen previously adjudicated matters before final judgment so long as they (1) explain on the record their reasons for doing so and (2) take appropriate steps to avoid prejudicial reliance on the previous ruling." *Washington-El v. DiGuglielmo*, 419

Fed.Appx. 275, 277 (3d Cir. 2011).  Again, in light of the oft-repeated admonition to courts to ensure that contractual arbitration provisions are enforced, and that an erroneous denial of a motion to compel arbitration would deny a contracting party the benefit of its right, I find that a fresh look at the State Court Judge's arbitration ruling is appropriate.  *See Olde Discount Corp. v. Tupman*, 1 F.3d 202, 215 (3d Cir. 1993) ("[T]he right of a party to enforce an arbitration agreement under the FAA depends . . . upon the traditional duty of the courts to protect the contractual rights of the parties.").

### B.    Reconsideration of Arbitration Ruling

The FAA manifests "a congressional declaration of a liberal federal policy favoring arbitration agreements...." *Moses H. Cone Memorial Hospital v. Mercury Constr. Corp.*, 460 U.S. 1, 24, 103 S.Ct. 927, 74 L.Ed.2d 765 (1983).  Section 2 of the FAA provides, in relevant part:

> A written provision in any maritime transaction or a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction ... shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract.

9 U.S.C. § 2.  The U.S. Supreme Court has described this provision as reflecting both a "liberal federal policy favoring arbitration," *Moses H. Cone Mem'l Hosp.*, *supra* at 24, and the "fundamental principle that arbitration is a matter of contract," *Rent–A–Center, West, Inc. v. Jackson*, 561 U.S. ——, ——, 130 S.Ct. 2772, 2776, 177 L.Ed.2d 403 (2010).  In light of these policies and principles, lower federal courts are directed to enforce arbitration agreements according to their terms.  *Volt Information Sciences, Inc. v. Board of Trustees of Leland Stanford Junior Univ.*, 489 U.S. 468, 478, 109 S.Ct. 1248, 103 L.Ed.2d 488 (1989).  District courts apply the summary judgment standard in determining the issue of arbitrability, hence courts may consider exhibits provided by the parties.

*Control Screening LLC v. Technological Application and Production Co. (Tecapro), HCMC-Vietnam*, 687 F.3d 163, 167 (3d Cir. 2012).

For arbitration agreements governed by the FAA, the interpretation and construction of those agreements is guided by federal substantive law. *See Invista S.A.R.L. v. Rhodia, S.A.*, 625 F.3d 75, 83 (3d Cir. 2010); *LaFurno v. Virbac Corp.*, Civil Action No. 11–4774 (SRC), 2012 WL 646029 (D.N.J. Feb. 24, 2012). Moreover, under section 2 of the FAA, "generally applicable contract defenses, such as fraud, duress, or unconscionability, may be applied to invalidate arbitration agreements." *Doctor's Assocs., Inc. v. Casarotto*, 517 U.S. 681, 687, 116 S.Ct. 1652, 134 L.Ed.2d 902 (1996). For these sort of contract issues, courts look to state law to as an "interpretive guide" and state law applies "to the extent it is consistent with the FAA ...." *Litman v. Cellco Partnership*, 655 F.3d 225, 231 n. 8. (3d Cir. 2011) *abrogated in part on other grounds by AT&T Mobility LLC v. Concepcion*, 131 S.Ct. 1740 (2011) (internal citations and quotation marks omitted).[4]

With these principles in mind, I turn to the question of arbitrability. The State Court Judge ruled on the two issues before any court faced with an arbitration clause: "(1) whether a valid

---

[4]     As the Third Circuit recently explained:

> We generally apply state contract principles to determine whether an arbitration agreement is unconscionable. However, the FAA preempts conflicting state rules that either prohibit arbitration outright, or that "stand[ ] as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress...." Thus, in determining unconscionability, we must use principles of [state] law, to the extent that such law is not displaced by the FAA.

*Quilloin v. Tenet HealthSystem Philadelphia, Inc.*, 673 F.3d 221, 230 (3d Cir. 2012) (internal citations omitted).

agreement to arbitrate between the parties exists; and (2) whether the plaintiff's claims fall within the substantive scope of the valid arbitration agreement." *PaineWebber v. Hartmann*, 921 F.2d 507, 510-11 (3d Cir. 1990), *overruled on other grounds*, *Howsam v. Dean Witter Reynolds*, 537 U.S. 79, 85 (2002). The parties challenge both aspects of the Judge's ruling, with Plaintiff contending that no valid agreement exists between it and H&M, and with Defendants arguing that the Judge erred in his conclusion that the allegations pled here do not fall within the scope of the subcontracts's arbitration clause.

Because I believe the State Court Judge committed a clear error of law, and because a different result would attend if I find that the Judge's reasoning was erroneous, I find reconsideration of the arbitration ruling appropriate. *See Lazaridis*, 591 F.3d at 669 (citing "the need to correct a clear error of law or fact or to prevent manifest injustice" as a basis for granting reconsideration); *Bowers*, 130 F.Supp.2d at 613 (explaining reconsideration should be granted only if the matters overlooked might reasonably have resulted in a different conclusion).

### 1.      Unconscionability

As an initial matter, Plaintiff argues that the arbitration clause is unconscionable, citing the New Jersey decision of *Kuhn v. Terminix Intern. Co., L.P.*, 2008 WL 1987432 (App. Div. May 9, 2008). *Kuhn* is unhelpful to Plaintiff for several reasons. First, *Kuhn* involves statutory consumer law-based claims that were not expressly referenced in the arbitration clause in that case, whereas the arbitration clause here expressly references both statutory and common law claims. More importantly, recent Supreme Court case law makes clear that the FAA trumps "state law that prohibits arbitration of a particular type of claim ...." *AT&T Mobility LLC v. Concepcion*, 131 S.Ct. 1740, 1747 (2011). Furthermore, to the extent that state law relates to the question of whether the

parties entered into an agreement to arbitrate, the subcontracts here call for the application of Wisconsin law—not New Jersey law.  Green Cert., Exh. B. at ¶ 10 (choice of law provision). Accordingly, Plaintiff's reliance on *Kuhn* is misplaced and I conclude that there is no impediment to the subcontracts' arbitration clause's enforceability.  Moreover, as Plaintiff acknowledged at oral argument, Plaintiff did not make this argument before the State Court Judge, which failure alone is a basis for denying reconsideration on this issue.

In this connection, the Court further notes that Plaintiff is hard-pressed to argue that the arbitration clause here, which was negotiated by two sophisticated, commercial parties, is unconscionable in light of the Supreme Court's holding regarding consumer arbitration clauses in *Concepcion.*  In that case, the Supreme Court overruled state law-based cases that had found class arbitration waivers unconscionable in consumer adhesion contracts because the "disputes between the contracting parties predictably involve small amounts of damages, and when it is alleged that the party with the superior bargaining power has ... deliberately cheat[ed] large numbers of consumers out of individually small sums of money."  *Litman*, 655 F.3d at 231 (discussing *Concepcion*'s overruling of the California Supreme Court opinion in *Discover Bank v. Superior Court*, 36 Cal.4th 148, 30 Cal.Rptr.3d 76, 113 P.3d 1100 (Cal. 2005)).  If these sort of consumer clauses are enforceable, certainly a bargained-for clause between two commercial parties is not subject to a generic unconscionability challenge here.

Plaintiff further argues that the oral agreement was procured by fraud, that is, that Defendants tricked him into agreeing to perform the weekend work knowing that they would later refuse to pay and would cite the "written" change order provision as a means for denying payment. Whether or not this is true, these sort of fraud allegations have no bearing on the applicability of the

subcontracts's arbitration clauses. "Like other contracts, [arbitration agreements] may be invalidated by 'generally applicable contract defenses, such as fraud, duress, or unconscionability." *Rent-A-Center*, *supra* at 2776. However, Plaintiff's fraud allegations go to the propriety of the oral agreement—Plaintiff does not allege that it was induced to enter the subcontracts. In ruling on arbitrability under the subcontracts, I do not reach the question of whether the oral agreement was procured by fraud.

Finally, Plaintiff argues that the forum-selection aspect of the arbitration clause renders it unconscionable because, as a New Jersey company, arbitration in Wisconsin is inconvenient. Since the subcontract calls application of Wisconsin law, I apply that state's unconscionability law. *See Quilloin*, 673 F.3d at 230 (noting that state law applies to unconscionability challenge to arbitration provision). "The rule of law in Wisconsin is that a forum selection clause is enforceable unless the contract provision is substantively unreasonable in view of the bargaining power of the parties." *Pietroske, Inc. v. Globalcom, Inc.*, 275 Wis.2d 444, 450, 685 N.W.2d 884 (Wis. Ct. App. 2004) (quoting *Leasefirst v. Hartford Rexall Drugs, Inc.*, 168 Wis.2d 83, 88-89, 483 N.W.2d 585 (Wis. Ct. App. 1992)). Wisconsin courts have upheld forum selection clauses where the forum of choice is the location of the defendant's headquarters and where, on the plaintiff's side, there is only one primary witness who would be required to travel. *See id.* at 454.

In this case, Defendant H&M is located in Wisconsin and it appears that Plaintiff could participate in the Wisconsin arbitration via telephone. Moreover, Plaintiff is already participating in an arbitration in Wisconsin brought by Lakeview against it. Green Cert. dated July 10, 2010, Exh. A. Hence I find that "there would be no major personnel or financial impact on [the Plaintiff]" for it to proceed in the Wisconsin forum on this matter as well. *Pietroske*, 275 Wis.2d at 452.

In this connection, the Court notes that all three parties are in distinct locations—Plaintiff in New Jersey; H&M in New York; and Lakeview in Wisconsin.  Wherever the arbitration were held, one of the parties would be required to travel.  Here, where the subcontracts explicitly provide that the arbitration must be held in Wisconsin, Plaintiff has not shown it will suffer a great travel inconvenience that cannot be overcome—either by Mr. Hautz, Hautz's principal and key witness, traveling on his own or being available by phone.

Furthermore, Plaintiff has not asserted that it lacks business acumen, or that the arbitration clause was printed in small print or otherwise difficult to comprehend.  *See id.* (upholding a forum selection clause under similar facts).  Indeed, it is in the same font and print as the remainder of the terms and conditions.  Thus, I see no basis for concluding that the forum selection clause is unconscionable under Wisconsin law.

Alternatively, there is a line of cases treating the question of the effect of a forum selection clause in a diversity case as a question of federal law.  Under this mode of analysis, a forum selection clause is deemed unreasonable if the party opposing it establishes "(1) that it is the result of fraud or overreaching, (2) that enforcement would violate a strong public policy of the forum, or (3) that enforcement would in the particular circumstances of the case result in litigation in a jurisdiction so seriously inconvenient as to be unreasonable."  *Coastal Steel Corp. v. Tilghman Wheelabrator Ltd.*, 709 F.2d 190, 202 (3d Cir. 1983); *Lester v. Gene Exp., Inc.*, Civil No. 09–0403 (RBK/JS), 2009 WL 3757155 (D.N.J. Nov. 10, 2009) (quoting same).  A forum is unreasonable, under this body of law, when the defendant can make a "strong showing" that the forum selected is "so gravely difficult and inconvenient that he will for all practical purposes be deprived of his day in court ...."  *Foster v. Chesapeake Ins. Co., Ltd.*, 933 F.2d 1207, 1219 (3d Cir. 1991) (quoting

*Bremen v. Zapata Off-Shore Co.*, 407 U.S. 1, 12, 92 S.Ct. 1907, 1914, 32 L.Ed.2d 513 (1972)).  *See also MoneyGram Payment Sys., Inc. v. Consorcio Oriental*, 64 Fed.Appx. 844, 846 (3d Cir. 2003). For the reasons expressed above, Plaintiff has not made a strong showing that travel to Wisconsin would impair his ability to obtain a fair resolution of the parties' dispute.  *See Cent. Contracting Co. v. Maryland Casualty Co.*, 367 F.2d 341, 344 (3d Cir. 1966) ("Mere inconvenience or additional expense is not the test of unreasonableness since it may be assumed that the plaintiff received under the contract consideration for these things.  If the agreed upon forum is available to plaintiff and said forum can do substantial justice to the cause of action, then plaintiff should be bound by his agreement.").

Plaintiff further cites a New Jersey case, *Sparwick Contracting*, for the proposition that New Jersey is the more convenient forum for a construction contract performed in the state.  *Sparwick* is easily distinguishable, however, because that case involved multiple suits brought in New Jersey and necessitated consideration of forum non conveniens principles.  *See* 335 N.J.Super. at 76-79. Needless to say, no such consolidation issue is presented here; in fact, the contrary is true, since one arbitration between Lakeview and Plaintiff is already proceeding in Wisconsin—not New Jersey. More importantly, *Sparwick* did not apply the FAA (or even Wisconsin law) but New Jersey state law.  Hence, for the reasons stated above, I find the arbitration clause in the subcontracts's terms and conditions enforceable.

### 2.    Scope of Arbitration Provision

Having concluded that the arbitration clause is not unconscionable, I now turn to whether the Plaintiff's claims fall within the scope of the clause.  In this connection, I note that it is not my role to determine whether the oral agreement is subject to the written change order provisions found

in the subcontracts or the change order agreement.  On a motion to compel arbitration, a court decides only whether the there exists a valid agreement to arbitrate, and whether the asserted claims are within the scope of the arbitration clause.  *See Paine Webber*, 921 F.2d at 510-11.  *Accord Dustrol, Inc. v. Champagne-Webber, Inc.*, 2001 WL 1326477, *6 (N.D.Tex. Oct. 16, 2001) (in case involving oral agreement supplementing construction work, focusing arbitrability analysis on whether the oral agreement claims was related to the parties' subcontract).  The question of whether the oral agreement is a valid change order under the subcontract or a separate change order agreement is reserved for the arbitrator. *See Phil Singer Associates v. Philips Oral Healthcare, Inc.*, No. Civ.A. 03–3578 (FLW), 2003 WL 23208271 at *6 (D.N.J. Dec. 16, 2003) ("On a motion to compel arbitration, pursuant to 9 U.S.C. § 4, I am not authorized to decide whether the agreement containing the arbitration clause was extended; I may decide only whether the plaintiff's allegations arise out of or relate to that agreement.").

The State Court Judge concluded that it was "less than fully clear that the intent of the parties was to compel arbitration for weekend work."  In other words, he concluded that Hautz sufficiently alleged that the oral agreement fell outside the scope of the arbitration clause.  I disagree and find this reasoning erroneous as a matter of law.  As an initial matter, case law makes clear that, on questions of arbitrability, all doubts should be construed in favor of arbitration.  *Becker v. Autoradio U.S.A., Inc. v. Becker Autoradiowerk GmbH*, 585 F.2d 39, 44 (3d Cir.1978).  It is only where "it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute" that enforcement of the arbitration clause is not required.  *Medtronic Ave. Inc. v. Advanced Cardiovascular Sys.*, 247 F.3d 44, 54 (3d Cir. 2001).  Thus, the touchstone of the arbitrability analysis is not whether the parties' intent is "less than fully clear" but whether

17

the arbitration clause is susceptible of an interpretation that covers the alleged dispute.

Here, the arbitration clause is certainly broad enough to encompass the additional weekend work.  As noted, the clause provides for arbitration of "ANY CONTROVERSY OR CLAIM ARISING OUT OF OR IN RELATION TO THIS PURCHASE ORDER/SUBCONTRACT OR ITS INTERPRETATION, CONSTRUCTION OR ANY BREACH THEREOF, *OR ANY RELATIONSHIP BETWEEN THE PARTIES HERETO* ...."  (emphasis added).  The U.S. Supreme Court has held that this sort of language encompasses disputes growing out of relationships created by the agreement containing the arbitration clause. *See Green Tree Financial Corp. v. Bazzle*, 539 U.S. 444, 451-52 (2003) (interpreting the following language:  "All disputes, claims, or controversies arising from or relating to this contract or the relationships which result from this contract ... shall be resolved by binding arbitration ....").  Here, the oral agreement clearly relates to Lakeview's and Hautz's general contractor-subcontractor relationship—but for the subcontracts, Hautz would not have performed any work on the Project.  Moreover, Plaintiff concedes in its motion papers that some of the work included in the alleged oral agreement was work that was governed by the subcontracts.

The State Court Judge further reasoned that the higher hourly rate allegedly authorized by the oral agreement helps bring that agreement outside the scope of the arbitration clause.  However, the Third Circuit held in *Becker* that "[t]he fact that there may have been a separate consideration for the claimed [separate oral contract]" does not undercut a finding that the oral contract falls within the scope of the arbitration clause.  585 F.2d at 46.  By analogy, this suggests that while, here, there may have been a higher payscale applicable to the oral agreement, that fact should not alter the court's arbitrability analysis.  Furthermore, "that the promised agreement would have utilized a

18

different compensation formula does not suggest that it fails to arise out of the [subcontract] agreement.  The key factor for determining whether a subsequent agreement arises out of an expired one, according to the *Becker* . . . Court, is whether the subsequent agreement touches upon issues addressed by the expired written agreement."  *Phil Singer*, 2003 WL 23208271 at *5.

Moreover, *Becker* found it critical that the alleged oral agreement in that case was reached during the pendency of the written agreement.  *Id.* at 44.  Here, too, Plaintiff alleges that the oral agreement was reached on July 20, 2010, and the subcontract agreements govern work completed between May 17, 2010 through August 13, 2010.  As other courts have noted, "[w]hether the obligation to arbitrate endured as the parties continued their business relationship without a renewed written . . . agreement is a dispute 'arising out of or in connection with' the last written agreement they had."  *Gaston Andrey of Framingham, Inc. v. Ferrari North America*, 983 F.Supp. 18 (D.Mass. 1997) *quoted in Phil Singer*, 2003 WL 23208271 at *5.   Plaintiff's counsel represented at oral argument that the "catch up" work was related to the first subcontract that governed the work to be completed by July 17, 2010.  This argument misses the mark, however, because all three subcontracts define the project period as May 17, 2010 to August 13, 2010, and Plaintiff's dispute relates to work completed during that timeframe.

Lastly, the State Court Judge found *Becker* inapplicable on its facts since that case involved an extension of an agreement "lock, stock, and barrel."  State Court Opinion at 5 (quoting *Becker*, 585 F.2d at 45).  Contrary to the judge's view, the oral agreement allegations here are actually akin to the facts of *Becker* in that the oral agreement could be viewed as an extension of the subcontracts. As noted, Plaintiff concedes that some of the work under the oral agreement was governed by the subcontracts and alleges that the additional work, which also relates to the Project, began during and

19

following the original subcontract completion dates.  Accordingly, the State Court Judge erred in concluding the arbitration clause is not susceptible of an interpretation that covers Plaintiff's dispute. For this reason, I conclude that Plaintiff must arbitrate its claims against Lakeview.

### 3.      H&M Non-Signatory Status

Having concluded that the arbitration clause is not unconscionable, and that Plaintiff must arbitrate its claims against Lakeview, I now turn to the parties' arguments regarding H&M's non-signatory status.  I wish to first clarify that H&M has consented to arbitration even though it is not a signatory to the subcontracts in which the arbitration clause is found.  This is significant because many cases addressing non-signatories deal with the question of whether a non-signatory can be compelled to arbitrate.  Here, in contrast, H&M seeks an order directing Hautz to arbitrate.  Thus, the question is not whether H&M could be compelled under the subcontract to arbitrate a dispute with Hautz, but whether H&M has standing under the subcontracts to bind Hautz to the arbitration provision.  *See E.I. DuPont de Nemours and Co. v. Rhone Poulenc Fiber and Resin Intermediates, S.A.S.*, 269 F.3d 187, 199 (3d Cir. 2001) (noting distinction between compelling a non-signatory to arbitrate versus directing a signatory to arbitrate "at the non-signatory's insistence").

The State Court Judge referenced *Pritzker*, *supra*, for the proposition that "arbitration agreements may be upheld against non-parties where the interests of such parties are directly related to, if not congruent with those of a signatory ...."  7 F.3d at 1122.  However, as noted above, the question is not whether H&M may be bound by the arbitration clause but whether H&M, as a non-signatory, may compel Hautz to arbitrate with it.  At oral argument, Defendants argued that H&M may bind Hautz under the third-party beneficiary doctrine.

"It is well-recognized that 'traditional principles of state law allow a contract to be enforced

by . . . nonparties to the contract through assumption, piercing the corporate veil, alter ego, incorporation by reference, *third-party beneficiary theories*, waiver and estoppel.'" *Branch v. Ottinger*, 477 Fed.Appx. 718, 720 (11th Cir. 2012) (quoting *Arthur Andersen LLP v. Carlisle*, 556 U.S. 624, 631, 129 S.Ct. 1896, 173 L.Ed.2d 832 (2009)) (emphasis added). Thus, "[i]n a series of cases, courts have allowed non-signatory third party beneficiaries to compel arbitration against signatories of arbitration agreements." *E.I. DuPont*, 269 F.3d at 199 (collecting cases). Whether a non-signatory is a third party beneficiary imbued with the right to enforce an arbitration provision is a question of state law. *See Carlisle*, 556 U.S. at 631. As noted, the subcontracts call for the application of Wisconsin law.

"The third-party beneficiary doctrine is a contract doctrine that is well established in Wisconsin." *Badger State, Inc. v. Keller Const. Co.*, 344 Wis.2d 123, 2012 WL 3029894, 820 N.W.2d 155 (Wis. Ct. App. 2012) (unpub.). Under Wisconsin law, a person who is not a party to a contract "may enforce a contract as a third-party beneficiary if the contract indicates that he or she was either specifically intended by the contracting parties to benefit from the contract or is a member of a class the parties intended to benefit." *Milwaukee Area Technical College v. Frontier Adjusters of Milwaukee*, 2008 WI App 76, ¶ 20, 312 Wis.2d 360, 752 N.W.2d 396 (Wis. Ct. App. 2008) (citing *Pappas v. Jack O.A. Nelsen Agency, Inc.*, 81 Wis.2d 363, 371-372, 260 N.W.2d 721, 725-726 (1978)). In other words, the party claiming third-party beneficiary status must "show that the agreement that was breached was entered into primarily and directly for [that party's] benefit ...." *Hoida, Inc. v. M & I Midstate Bank*, 291 Wis.2d 283, 717 N.W.2d 17 (2006).

At oral argument, H&M pointed to language in its agreement with Lakeview to support its argument that it is a third party beneficiary to the subcontracts. Section 5.3.4.1 of the Prime

21

Contract provides: "Without limiting the generality of the foregoing, the Contractor shall include the following provisions in each of its subcontracts: a provision that the Owner is a third-party beneficiary of the subcontract entitled to enforce any rights thereunder for its benefits ...." However, as H&M acknowledged at oral argument, there is no such language found in the subcontracts' terms and conditions. Rather, the subcontracts only generally incorporate terms of the Prime Contract: ". . . THE TERMS OF THE CONTRACT, INCLUDING BUT NOT LIMITED TO LIQUIDATED DAMAGES, TIMELY COMPLETION, AND LIEN WAIVER UPON RECEIPT OF PAYMENT ARE INCORPORATED IN THIS PURCHASE ORDER/SUBCONTRACT BY REFERENCE." Green Cert., Exh. B at ¶ 9. H&M argues that section 5.3.4.1 in conjunction with the general incorporation language, read together, make clear that H&M is a third-party beneficiary to the subcontracts and that it has the authority to exercise the right to arbitrate found in the subcontracts.

        In my view, these two provisions do not provide a firm foundation for the assertion of third-party beneficiary status. As noted, despite the directive found in section 5.3.4.1 of the Prime Contract, there is no third-party beneficiary language in the subcontracts' terms and conditions. That the subcontracts incorporate the Prime Contract by reference does not, as a matter of law, generate such a third-party beneficiary provision where one does not exist. What further complicates matters is that the subcontracts call for application of Wisconsin law while the Prime Contract calls for application of New York law. Thus, to the extent that H&M seeks to rely upon section 5.3.4.1 of the Prime Contract, it should be pointing to New York case law interpreting similar provisions. That it has not done. Finally, I am troubled by H&M's redlining of the arbitration clause in the Prime Contract, which made clear its intent not to arbitrate disputes with Lakeview. Of course, one can argue, as H&M does, that its decision not to arbitrate disputes with

22

Lakeview does not mean that it waived any right to seek arbitration in a subcontractor dispute where its interests are typically aligned with that of the general contractor.  Nevertheless, I find the inconsistencies in the subcontract and Prime Contract too tenuous a ground upon which to base my third-party beneficiary ruling.  Accordingly, as the subcontracts call for application of Wisconsin law, and H&M seeks to enforce the terms and conditions of those agreements, I turn to Wisconsin case law for additional guidance.

Wisconsin courts have addressed third-party beneficiary relationships in the context of construction agreements.  For example, the Wisconsin Court of Appeals has ruled that a subcontractor was a third-party beneficiary to the contract between the owner and the general contractor.  *See CleanSoils Wisconsin, Inc. v. DOT*, 229 Wis.2d 600, 611-12, 599 N.W.2d 903 (Wis. Ct. App.1999) *as discussed in Koshick v. State*, 287 Wis.2d 608, 706 N.W.2d 174 (Wis. Ct. App. 2005).[5]  In addition, in *Badger, supra*, the Wisconsin Court of Appeals concluded that a subcontractor was a third party beneficiary of the agreement between the owner and the general contractor because the general conditions of their agreement contained provisions that directly benefitted the subcontractor, such as a clause requiring the contractor to "promptly pay each

---

[5]      The Wisconsin Supreme Court has yet to address whether an owner should be accorded third-party beneficiary status to a contract between a subcontractor and a general contractor on the owner's project.  *See Linden v. Cascade Stone Co., Inc.*, 283 Wis.2d 606, 626-27 n.4, 699 N.W.2d 189 (Wis. 2005) (discussing non-Wisconsin cases in which an owner was accorded third-party beneficiary status against a subcontractor because "the subcontractor has agreed to perform an obligation that the [general] contractor owes to the owner," yet concluding that "because the [owners] did not present their contract claim for our review, we take no position on whether such a claim could be maintained").  Accordingly, I turn to the Wisconsin Court of Appeals for guidance in predicting how the Wisconsin Supreme Court would rule.  *See Wayne Moving & Storage of New Jersey, Inc. v. School Dist. of Philadelphia*, 625 F.3d 148, 154 (3d Cir. 2010) ("We begin our analysis with intermediate state court judgments and grant them significant weight in the absence of an indication that the highest state court would rule otherwise.") (internal quotation marks omitted).

Subcontractor ....” 344 Wis.2d at *4.[6] Moreover, in that case, the contractor and owner proceeded to arbitration and, once an award was entered, the Wisconsin Court of Appeals held that the subcontractor, as a third-party beneficiary, had the right to enforce the arbitration award. *Id.* While both of these cases involve subcontractors claiming third-party beneficiary status, their analysis is nonetheless instructive to an owner claiming that same status. In these cases, there was, like here, no explicit provision creating third-party beneficiary status. Yet, the courts found third-party beneficiary status where the contracts benefitted the party seeking to enforce a right provided therein.

Applying this sort of analysis here, I conclude that H&M is a third party beneficiary of the subcontracts. The terms and conditions of the subcontracts clearly benefit H&M. For example, the terms provide that "THE SUBCONTRACTOR SHALL BE FULLY RESPONSIBLE FOR ALL SUCH OBLIGATIONS AND ANY OTHER CLAIMS OR LIENS AGAINST THE . . . OWNER." Green Cert., Exh. B., ¶ 7. This benefits H&M by ensuring that any liens against it must be paid by Hautz. Accordingly, just as the party in *Badger*, H&M is a third party beneficiary to the subcontracts and, consequently, it may enforce the arbitration clause against Hautz.

Even if H&M were not a third-party beneficiary of the subcontracts, H&M would be entitled to enforce the arbitration provision against Hautz under the doctrine of equitable estoppel. That doctrine applies where, like here, a non-signatory seeks to enforce an arbitration clause against a signatory. *See Derbin v. Access Wealth Management, LLC*, Civil Action No. 11–812 (FLW), 2011 WL 4751992 (D.N.J. Oct. 7, 2011) (discussing doctrine). Under this doctrine, "when the issues the

---

[6]      Unpublished Wisconsin appellate court opinions issued after July 1, 2009, such as this one, may be cited for persuasive value. *See* Rules of Appellate Procedure 809.23(3).

nonsignatory is seeking to resolve in arbitration are intertwined with the agreement that the estopped party has signed," *Smith/Enron Cogeneration Ltd. Partnership, Inc. v. Smith Cogeneration Intern., Inc.*, 198 F.3d 88, 98 (2d Cir. 1999), a plaintiff who treats the non-signatory and signatory party as jointly liable for the same alleged conduct is estopped from resisting arbitration with the non-signatory.  *See id.  See also Astra Oil Co. v. Rover Navigation, Ltd.*, 344 F.3d 276, 280 (2d Cir. 2003); *F. Hoffman-La Roche Ltd. v. Qiagen Gaithersberg, Inc.*, 730 F.Supp.2d 318, 329 (S.D.N.Y. 2010); *Tickanen v. Harris & Harris, Ltd.*, 461 F.Supp.2d 863, 869 (E.D.Wis. 2006) ("[E]quitable estoppel . . . applies when the signatory raises allegations of . . . substantially interdependent and concerted misconduct by both the nonsignatory and one or more of the signatories to the contract.") (quoting *Hoffman v. Deloitte & Touche, LLP*, 143 F.Supp.2d 995, 1004-05 (N.D.Ill.2001) (internal quotation marks omitted).[7]  Whether the issues are intertwined is a fact-specific inquiry.  Courts should consider "the relationship between the parties, the contracts they signed, and the issues that

---

[7]      On questions of equitable estoppel, the Supreme Court's 2009 decision in *Arthur Andersen, LLP, supra* states that state law governs.  *See* 556 U.S. at 631.  In a prior decision of mine, I cited to New Jersey state law, which was the law relied upon by the party seeking to compel arbitration in that case, as well as federal law.  *See Derbin*, 2011 WL 4751992 at *4.  Consistent with this approach, the Third Circuit has relied upon state law in conjunction with federal jurisprudence in addressing these sorts of issues.  *See, e.g., Century Indem., supra* at 534-35, 535 n.18 (citing Second Circuit and Third Circuit law).  Here, my research has not revealed Wisconsin case law directly addressing under what circumstances a non-signatory may compel a signatory to arbitrate pursuant to an equitable estoppel theory.  Hence I rely on federal court decisions in my analysis.  In this connection, I note that many post-*Arthur Andersen, LLP* circuit decisions apply federal equitable estoppel law in cases involving non-signatories seeking to compel arbitration.  *See, e.g., Aggarao v. MOL Ship Management Co., Ltd.*, 675 F.3d 355, 374 (4th Cir. 2012) (applying Fourth Circuit law); *Weingarten Realty Investors v. Miller*, 661 F.3d 904 (5th Cir. 2011) (applying Fifth Circuit law); *Ragone v. Atlantic Video at Manhattan Ctr.*, 595 F.3d 115, 126 (2d Cir. 2010) (applying Second Circuit law); *Mundi v. Union Sec. Life Ins. Co.*, 555 F.3d 1042, 1045-46 (9th Cir. 2009) (relying on Ninth, Fifth, and Second Circuit law).  *But see Lawson*, 648 F.3d at 1172 (applying Georgia state law).

arose between them." *Astra Oil*, 344 F.3d at 279-80.[8]

Here, Plaintiff's treatment of Lakeview and H&M in its complaint is indistinguishable. Plaintiff alleges in its breach of contract count that it "agreed to perform the work based upon the promise of defendants H&M and Lakeview to pay plaintiff for services . . . ," Compl., ¶ 7, and that "Defendants refused to pay plaintiffs for its services . . . ," *id.* at ¶ 8. In addition, Plaintiff seeks judgment against both entities "jointly and severally" *Id.* at ¶ 9. In the quantum meruit count, Plaintiff similarly alleges that both entities are liable and have refused to pay for the weekend work. *See id.* at Second Count, ¶ 3 ("Defendant(s) H&M, Lopez, Lakeview and Davis made such promise to pay . . . with the intention to induce reliance ...."). Hautz's certification further treats both defendants as jointly responsible for negotiating the oral agreement and for failing to pay for the work.

At oral argument, Plaintiff argued that it did not intend to assert the unjust enrichment claim against both Lakeview and H&M; Plaintiff intended to assert that claim solely against H&M. Whether or not that was Plaintiff's intent, the complaint is currently drafted as if it seeking unjust enrichment against both defendants. But even if Plaintiff amended its complaint to correct this error, the complaint, as a whole, still treats both defendants as jointly responsible and liable for the work completed.

---

[8]     To be clear, cases that address the "direct benefit" estoppel theory are inapposite. Those cases relate solely to non-signatories that are seeking to avoid, as opposed to compel, arbitration. *See Zurich American Ins. Co. v. Watts Industries, Inc.*, 417 F.3d 682 (7th Cir. 2005) (discussing cases); *Everett v. Paul Davis Restoration, Inc.*, Civil Action No. 10–C–634, 2012 WL 4128016, *5 (E.D.Wis. Sept. 18, 2012) ("PDRI argues that Ms. Everett is bound by the Franchise Agreement, even though she did not sign it, under the direct benefit estoppel doctrine. Under this doctrine, "[a] nonsignatory party is estopped from avoiding arbitration if it knowingly seeks the benefits of the contract containing the arbitration clause.").

Accordingly, in my view, "by treating the [two] entities as a single unit" in its complaint and in Hautz's certification, Plaintiff is estopped from claiming that H&M is distinct from Lakeview for purposes of arbitration. Plaintiff "cannot . . . shield itself from arbitration by arguing that only the [subcontract] contains an enforceable arbitration clause ...." *Smith/Enron*, 198 F.3d at 98. *See also Ross v. American Exp. Co*., 547 F.3d 137 (2d Cir. 2008) (noting that doctrine has been applied where a "non-signatory to [a] construction contract containing an arbitration clause [was] named therein as having certain tasks to perform under that contract.") (discussing *Choctaw Generation Ltd. Partnership v. American Home Assurance Co.*, 271 F.3d 403, 406 (2d Cir. 2001)). *See also Tickanen*, 461 F.Supp.2d at 869 (reasoning that signatory may be estopped where it alleges that the non-signatory and signatory engaged in "substantially interdependent and concerted misconduct"). Moreover, to the extent that Plaintiff would no longer seek quantum meruit from Lakeview, the claims against both parties are so intertwined that I would nonetheless conclude that Plaintiff is estopped from declining to arbitrate with H&M. Accordingly, while I take issue with the State Court Judge's analysis, I nonetheless agree that H&M may enforce the arbitration clause against Hautz.

### C. Cross-Motion for Reconsideration

I now turn to Plaintiff's cross-motion for reconsideration. Hautz asks this Court to reconsider the State Court Judge's dismissal of Defendants Lopez and Davis, arguing that the Judge erroneously concluded that those employees acted within the scope of their employment. In the May 15th ruling, the State Court Judge reasoned that, because Lakeview and H&M did not assert the defense that these employees acted outside of the scope of their employment, there was no basis for asserting claims against them in their individual capacities. In Hautz's view, that it alleges that

Lopez and Davis defendants acted fraudulently authorizes Hautz, therefore, as a matter of law, to sue them individually for their actions in luring Hautz into the oral argument despite the allegations in the complaint that they acted in the scope of their employment.

Citing New Jersey Court Rule 1:6-6, which states that counsel's representations at oral argument are not "facts" included in the record,  Hautz also argues that the Judge inappropriately based his factual ruling on defense counsel's statement at oral argument that Lopez and Davis were not acting in their individual capacities.  In my view, the plain language of the State Court Opinion belies this interpretation of the Judge's ruling.  The Judge stated, in the opinion, that "[t]here is no defense raised, as counsel *alluded to* at oral argument, that Mr. Lopez and Mr. Davis acted at any time outside the scope of their employment."  State Court Opinion at 4 (emphasis added).  This is a record-based determination.  No answer had yet been filed and, as of the date of the Judge's decision, Defendants had not asserted any defense to vicarious liability.

Putting that argument aside, the complaint and Hautz's Certificate assert that Lopez and Davis negotiated the oral agreement on behalf of Lakeview and H&M.  Plaintiff cites authority that an employee's conduct is not within the scope of his employment "if it is different in kind from that authorized, far beyond the authorized time or space limits, or too little actuated by a purpose to serve the master."  *Roth v. First Nat'l State Bank*, 169 N.J.Super. 280, 285 (App. Div. 1979) (quoting *Commercial Union Ins. Co. v. Burt-Thomas-Aitken Constr. Co.*, 49 N.J. 389, 392, n.1 (1967)).  Simply restating this black letter law, without analysis, does not convince this Court that the State Court Judge erred in concluding that Lopez and Davis are alleged here to have acted within the scope of their employment.

Hautz, further, points to *Fid. & Dep. Co. of Md. v. Stamateris*, 2011 N.J.Super. Unpub.

28

LEXIS 2015, 7-9 (App. Div. 2011), in support of his view.  The employee in that case was a borrowed or "special employee", and, as such, the court engaged in an analysis specific to such employees.  *Id.* at *8.  Here, in contrast, there is no allegation that Lopez or Davis are such "special employees," thus, *Stamateris*'s analysis is not on point.  Finally, Hautz cites N.J.S.A. 59:2-10, which provides that "[a] public entity is not liable for the acts or omissions of a public employee constituting a crime, actual fraud, actual malice, or willful misconduct."  Obviously, this provision is inapplicable by its own terms.

Finally, defense counsel confirmed at oral argument, after conferring with Lakeview and H&M, that they do not intend to assert that Lopez or Davis acted outside their employment in allegedly negotiating with Hautz for extra work.  Defendants are bound by this representation. Therefore, for the foregoing reasons, I deny Plaintiff's cross-motion for reconsideration and Defendants Lopez and Davis remain as dismissed parties.

### D.    Form of Relief

One matter remains.  While Defendants are correct that the subcontracts call for arbitration in Wisconsin, it is not clear as a matter of law that an out-of-district court can compel arbitration in another district.  The FAA authorizes

> [a] party aggrieved by the alleged failure, neglect, or refusal of another to arbitrate under a written agreement for arbitration [to] petition any United States district court ... for an order directing that such arbitration proceed in the manner provided for in such agreement.... The court shall hear the parties, and upon being satisfied that the making of the agreement for arbitration or the failure to comply therewith is not in issue, *the court shall make an order directing the parties to proceed to arbitration in accordance with the terms of the agreement. The hearing and proceedings, under such agreement, shall be within the district in which the petition for an order directing such arbitration is filed.*

9 U.S.C. § 4 (emphasis added).  In *Econo-Car Int'l, Inc. v. Antilles Car Rentals, Inc.*, 499 F.2d 1391, 1394 (3d Cir.1974), the Third Circuit interpreted this language to mean that a district court lacks authority to order arbitration to proceed outside its own judicial district.

Important here, the circuit also recognized that a "perplexing dilemma arises when an agreement provides for arbitration outside of the district in which the petition [to compel arbitration] is filed." *Port Erie Plastics, Inc. v. Uptown Nails, LLC*, 173 Fed.Appx. 123, 127 n.4 (3d Cir. 2006) (quoting *Econo-Car*, 499 F.2d at 1394).  The circuit ultimately resolved this dilemma by concluding that a district court must "heed the unambiguous statutory language limiting the district court's power to order arbitration outside of the district." *Id.* (quoting *Econo-Car*, 499 F.2d at 1394). In *Econo-Car*, the circuit did not address whether, under the FAA, a district court could compel arbitration in its own district in the face of a forum selection clause designating an out-of-district arbitration.  However, following *Econo-Car*, many district courts have opted to dismiss actions in which a party seeks to compel arbitration outside the court's own district.  *See Port Erie*, 173 Fed.Appx. at 128 (collecting cases).  *See, e.g., Newhall v. Chase Home Finance, LLC*, Civ. Action No. 10-2749 (WJM), 2010 WL 4387517 (D.N.J. Oct. 28, 2010) ("When an arbitration agreement contains a forum selection clause, courts outside of that forum lack authority to order arbitration pursuant to the agreement.") (citing *Econo-Car*, 499 F.2d at 1394).

In line with this approach, I dismiss Plaintiff's suit so that the parties may proceed to arbitration in accordance with the terms of the subcontracts.  Furthermore, I note that neither party has requested that this matter be stayed and, in light of my finding that all of Plaintiff's claims are subject to arbitration, I see no reason why a stay would be warranted.  *Flexi-Van Leasing, Inc. v. Through Transport Mut. Ins. Ass'n Ltd.*, 108 Fed. App'x 35, 38 (3d Cir. 2004) (affirming district

court's dismissal of suit where all claims were arbitrable and moving party did not request a stay);

*Rhodia Inc. v. Bayer Cropscience Inc.*, Civ. No. 04–6424 (GEB)(MF), 2007 WL 3349453, *5

(D.N.J. Nov. 7, 2007) ("If all the claims in an action are arbitrable, a court may dismiss the action

instead of staying it."). *Compare Lloyd v. Hovensa, LLC*, 369 F.3d 263, 269 (3d Cir. 2004) ("[T]he

plain language of § 3 [of the Chapter 1 of the FAA] affords a district court no discretion to dismiss

a case *where one of the parties applies for a stay pending arbitration*.") (emphasis added).  In this

case, dismissal is appropriate.

## IV.    CONCLUSION

For the reasons stated above, Defendants' request for reconsideration is granted, and the

State Court Judge's ruling on arbitration reversed.  Arbitration of all claims is mandated by the

Plaintiff's subcontracts with Lakeview.  Plaintiff's cross-motion for reconsideration is granted but

the State Court Judge's dismissal of Defendants Lopez and Davis is affirmed.  In light of my ruling

on the arbitration issue, the case is hereby DISMISSED.

Dated: November 20, 2012                         /s/ Freda L. Wolfson_____
                                                 Freda L. Wolfson, U.S.D.J.